**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02046-GPG-SBP

LAKESHORE VILLAGE HOMEOWNERS ASSOCIATION,

     Plaintiff,

v.

GENERAL STAR INDEMNITY COMPANY,
a Corporation,

     Defendant.

---

### LAKESHORE VILLAGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Lakeshore Village Homeowner's Association ("Lakeshore Village"), by its undersigned counsel of record, submits its motion for partial summary judgments of liability on its First Claim for breach of contract and its Third Claim for violation of the Unreasonable Delay/Denial Statute, C.R.S. §§ 10-3-1115 and 1116, pursuant to Fed.R.Civ.P. 56.

### I.      Background of the Motions

Lakeshore Village is a residential condominium complex consisting of fifteen two-story buildings, fourteen one-story garage buildings and a clubhouse building that were damaged by a hailstorm in August of 2018. Lakeshore Village was insured by General Star Indemnity Co. ("General Star") and timely made a claim for insurance benefits. General Star acknowledged the claim and in March of 2019 issued a total denial of coverage, stating its investigation had determined that the damages to Lakeshore Village were caused by a hailstorm that predated General Star's policy period.

Lakeshore Village hired a licensed claim professional to investigate, Derek O'Driscoll of Impact Claim Services. He wrote General Star's representative, Anthony Colucci, to point out

significant errors in General Star's conclusion, starting with its consultant's report which noted some of the hail impacts to shingles that that had likely occurred during the policy period were "non-functional," and General Star's policy covers all physical loss or damage, functional and cosmetic, unless specifically excluded. General Star did not respond other than to maintain its denial.

In July 2019, Lakeshore Village's claim professional submitted authoritative peer-reviewed publications and shingle manufacturers' bulletins establishing that the hail impact damage to the shingles was functional, and the policy would cover the damage regardless. General Star made no response to this submission at all, though Lakeshore Village followed up multiple times to request some response. Finally, more than nine months later General Star acknowledged the Sworn Statement in Proof of Loss submitted by Lakeshore Village in March 2020 – with still no response to the July 2019 information. General Star admits that it didn't even investigate to evaluate the information. Finally, after extensive other delays, two years after the denial General Star admitted it was wrong and accepted coverage in May 2021.

This undisputed record establishes General Star's liability for breach of the policy by a wrongful denial, refusing to investigate, and misconstruing and misrepresenting its coverage until it was forced to concede. The undisputed record also shows its violations of C.R.S. §§ 10-3-1115 and 1116 (the "Unreasonable Delay/Denial Statute") by both unreasonably denying coverage and unreasonably delaying payment. Summary judgment of liability as a matter of law should enter on Lakeshore Village's First and Third Claims for Relief.

## II.      Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id*.

If the movant carries the initial burden of making a *prima facie* showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the court views in the light most favorable to it. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed.2d 142 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

### III.    Statement of Undisputed Material Facts

1.    General Star Indemnity issued Lakeshore Village Policy No. IAG967350 with effective dates of coverage from May 5, 2018 through May 5, 2019. ECF 3-1, Certified Copy of Policy, p.1.

2.    The policy provides commercial property insurance for the Lakeshore Village community located at 4835 South Balsam Street, Littleton, Colorado. *Id.* at p.1 of 98.

3.    On or about August 14, 2018, while the Policy was in full force and effect, Lakeshore's insured property was damaged as a result of a hail and wind event and ensuing

losses. Lakeshore duly and timely notified General Star of its loss, and claim no. G10047068

was assigned (the "Claim"). ECF 3, ¶¶ 5, 8; ECF 11, ¶ 8.]

4.      The insurance policy issued to Lakeshore Village by General Star contains the

following relevant provision regarding physical loss or damage:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the
premises described in the Declarations caused by or resulting from any Covered
Cause of Loss.

ECF 3-1 at p. 16.

5.      The insurance policy issued to Lakeshore Village by General Star contains the

following additional relevant provision regarding covered causes of physical loss or damage:

**A. Covered Causes of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct
physical loss unless the loss is excluded or limited in this policy.

ECF 3-1, Form CP 10 30 09 17 at 1 (p. 76 of 98). Hail is not excluded as a cause of loss in the

Causes of Loss – Special Form, and is therefore covered. *Id.*, pp. 76-85.

6.      There is no language in the policy that states that coverage for "direct physical

loss or damage" does not include nonfunctional damages that do not reduce the life of the

component. ECF 3-1; *see also* Exh. 1 at 30:2 – 42:24 (Dep. of Brad Thompson, Corp. Rep.).

7.      General Star retained consultant/engineer Joseph Shahid[1] of Applied Building

Sciences who investigated the loss and prepared a report dated February 5, 2019 ("ABS

Report"). In his report, Shahid confirmed hail damage and identified hail storms possibly

causing the damages at Lakeshore Village in 2016, outside of the General Star policy period, as

---

[1] Shahid is not a licensed Professional Engineer in Colorado, but is licensed in other jurisdictions.

well as hail storms that occurred on or about the date of loss in 2018, during the policy period,

without any definitive determinations of when damage occurred. Among other statements, the

report concludes:

a. Observations of the building exteriors revealed evidence of <u>minor hail impact to the composite siding (Photo 20). These locations were generally small and nicked off the outer paint layer of the siding.</u> Exh.1 at p. 12, ¶ 13 (emphasis added).

b. <u>The frequency of granule loss locations is consistent with the approximate seven hail events that have occurred in the vicinity of the property over the last five years.</u> Relatively recent spatter marks on the light poles and electrical boxes were more concentrated on the north and west facing surfaces, indicating that the hail events within the last year, including the reported June 19, 2018 date were directional from the northwest towards the southeast. *Id.* at p. 17 (emphasis added).

c. <u>Observations of auxiliary components and the building exteriors confirms the presence of hail impact. Isolated locations of hail impact nicks on the siding and fractures to some vinyl window trim were observed. These conditions constitute damage and should be repaired.</u> The indentations in the downspouts and roof vents did not appear to functionally damage these components. *Id.* at 17 (emphasis added).

d. The characteristics of these larger granule loss locations correlates with the larger hail sizes <u>estimated to have impacted</u> during a July 28, 2016 hail event. Some of the vinyl trim pieces exhibited evidence that they had been present for an extended period of time indicating that they were <u>not likely caused</u> by a 2018 hail storm, but were <u>likely caused</u> by the same 2016 hail event. <u>The smaller locations of granule loss with less oxidation correlates to the relatively recent spatter markings on the light poles, vents, and electrical boxes which may have been attributable to the July 19, 2018 hail event or a subsequent event on August 14, 2018.</u> *Id.* at p. 18 (emphasis added).

e. In the conclusion, the ABS report identifies damages from hail throughout the complex, which could not be definitively attributed to any particular storm during the five years the shingles had been on the roofs:

Based on my education, knowledge, skill, training, observations, weather research, and experience with similar problems, <u>the Lakeshore Village complex has sustained limited functional roof damage potentially related to hail impact.</u> All roofs exhibited similar characteristics with good granule coverage, flexibility, and good adhesion between courses consistent with their reported age of less than 5 years old. <u>Minor granule loss was observed on all roofs and slopes with more granule loss on the north and west slopes. The frequency of granule loss locations is consistent with the approximate seven hail events that have occurred in the vicinity of the property over the last five years.</u> Relatively recent spatter marks on the light poles and electrical boxes were more concentrated on the north and west facing surfaces, indicating that

5

the hail events within the last year, including the reported June 19, 2018 date were directional from the northwest towards the southeast. The relatively recent spatter marks and fresher (less oxidized) locations of minor granule loss were smaller in size (less than ¾ inch in width) which corresponds to the more recent hail events listed in CoreLogic. The north slope generally exhibited the largest granule loss locations in terms of quantity and size. Despite the frequency of loss locations there was minimal locations of functional damage to include bruising or mat fracture, indicating the water shedding capacity and service life of the shingles have not been adversely affected. However, several ridge shingles exhibited mat fractures consistent with hail impact. In locations where the granule loss was larger and the shingles were fractured (typically larger than 1½ inches in width), there was also evidence of oxidation of the exposed asphalt and the impact locations did not appear as fresh. This is consistent with older impacts as listed in the CoreLogic report. Observations of auxiliary components and the building exteriors confirms the presence of hail impact. Isolated locations of hail impact nicks on the siding and fractures to some vinyl window trim were observed. These conditions constitute damage and should be repaired. The indentations in the downspouts and roof vents did not appear to functionally damage these components.

ABS attempted to date the hail impact at the Lakeshore Village complex. In general, the larger width granule loss locations and locations with oxidation were likely not caused by a recent hail event. The characteristics of these larger granule loss locations correlates with the larger hail sizes estimated to have impacted during a July 28, 2016 hail event. Some of the vinyl trim pieces exhibited evidence that they had been present for an extended period of time indicating that they were not likely caused by a 2018 hail storm, but were likely caused by the same 2016 hail event. The smaller locations of granule loss with less oxidation correlates to the relatively recent spatter markings on the light poles, vents, and electrical boxes which may have been attributable to the July 19, 2018 hail event or a subsequent event on August 14, 2018. The more recent hail spatter marks do not appear to have been sufficient in size to have caused the observed fractures of the shingles, ridge caps, and window vinyl trim components.

Regardless of which hail event caused the observed condition, ABS is providing a general scope of repair recommendations. *Id.* at pp. 17-18 (emphasis added).

8.      On March 13, 2019, General Star's claim adjuster, Anthony Colucci, denied

Lakeshore Village's claim. General Star's denial of coverage was based entirely on the ABS

report, stating that "it appears that any hail damage at the loss location occurred prior to the

effective date of your policy of insurance with General Star of May 5, 2018. There is no

coverage for the damage under your policy accordingly. You may wish to pursue a claim under

any applicable prior insurance policy for the date of loss of July 28, 2016. Our file is now closed." Exh. 3 (March 13, 2019 letter from Colucci).

9.      On April 1, 2019,  O'Driscoll wrote Colucci acknowledging receipt of General Star's denial and requesting General Star's underwriting information and the engineering report prepared by Shahid. After receiving no response to this letter, O'Driscoll emailed Colucci on April 18, 2019. *See* Exh. 4 (O'Driscoll April 2019 letter and email).

10.     After receiving no response to his April 1st letter and April 18th email, O'Driscoll again emailed Colucci requesting a response. *See* Exh. 5, O'Driscoll May 7, 2019 email.

11.     On May 22, 2019, O'Driscoll called Colucci and left a voicemail message. On May 28, O'Driscoll sent another email to Colucci following up to request responses to his prior emails and voicemail. *See* Composite Exh. 6.

12.     The following day, Holberton emailed O'Driscoll that the claim had been denied and that the questions posed in his April 1 letter "do not relate to the issue at hand." *See* Composite Exh. 6, Holberton May 29, 2019 email.

13.     In response to Holberton's email, on June 5, O'Driscoll inquired whether General Star would be responding to his April 1, 2019 letter requesting clarification of its coverage denial and Shahid's findings. After receiving no response from Holberton or Colucci. Om June 14, O'Driscoll sent another email to Holberton. *See* Exh. 7, O'Driscoll June 5 and 14 2019 O'Driscoll emails.

14.     On June 25, 2019, O'Driscoll emailed Colucci and Holberton that their lack of response to his April letter and subsequent emails and voicemail was delaying his investigation. *See* Exh. 8, O'Driscoll June 25, 2019 email.

15.     On June 28, 2019, Colucci responded to O'Driscoll's April 1 letter, informing him that their coverage position would remain the same, that the ABS report had concluded the damage to Lakeshore Village was caused by a storm outside of the General Star policy period, and that the underwriting information requested was General Star's work product and would not be provided. Colucci reiterated that "our file is once again closed." *See* Exh. 9, Colucci June 28, 2019 letter.

16.     On July 4, 2019, O'Driscoll, wrote General Star, requesting information and noting that ABS report reflected that Shahid applied distinctions based on whether hail damage was functional or cosmetic (nonfunctional) in his opinion, contrary to the comprehensive coverage language in the policy. O'Driscoll provided citations to authoritative peer-reviewed articles that determined hail impacts causing granule loss – such as identified in the ABS report – constitute functional damage, and provided the manufacturers' technical bulletins, including the manufacturer of the shingles used on Lakeshore Village buildings, to the same effect. *See* Exh. 10 (July 4, 2019 letter from ICS).

17.     On August 13, 2019, O'Driscoll emailed Colucci requesting a response to his July 4 letter. After no response, on September 18, 2019 O'Driscoll sent a follow up email. After no response, on October 18, 2019, O'Driscoll sent a letter to Colucci requesting a response to the authoritative materials in his July 4 letter and asked why General Star refused to respond for four months. *See* Exh. 11, Composite Exhibit of O'Driscoll Correspondence.

18.     General Star provided no response, ever, to O'Driscoll's July 4, 2019 letter.

19.     General Star did not investigate the information provided in the July 4, 2019 letter in any fashion, and did not provide that letter or its references to its consultant, Shahid. Exh. 12 at 133:11 – 144:21 (Dep. of Colucci, Vol. I, 9/3/2025).

20.     On March 19, 2020, O'Driscoll submitted Lakeshore Village's Sworn Statement in Proof of Loss ("SSPOL") in the amount of $5,059,920 (ACV, net of the deductible) with supporting authoritative materials, by email and certified mail to Colucci and to the President of General Star, Ted Gaisford, requesting a response within 30 days consistent with the Loss Payment provision of the policy. *See* Exh. 13, O'Driscoll March 19, 2020 Letter with SSPOL.

21.     After the June 28, 2019 letter to O'Driscoll, General Star did not communicate to Lakeshore Village at all for more than nine months until April 6, 2020, when O'Driscoll received a letter from Brad Thompson, General Star's Vice President, merely acknowledging receipt of the SSPOL. *See* Exh. 14, Thompson April 6, 2020 letter.

22.     On April 10, 2020, Holberton, General Star's outside adjuster, wrote O'Driscoll rejecting Lakeshore Village's SSPOL. *See* Exh. 15, April 10, 2020 letter.

23.     On April 24, 2020, Colucci wrote O'Driscoll reiterating that Lakeshore Village's damages pre-dated the General Star policy by two years, that General Star would maintain its previous denials of coverage, and that General Star had retained another engineer, Nelson Forensics. *See* Exh. 16, April 24, 2020 letter.

24.     On May 19, 2020, O'Driscoll wrote Colucci reiterating that the policy states that it pays for all direct physical loss or damage, whether functional or non-functional and requested that General Star provide Nelson Forensics with that coverage definition and the background information submitted with the Lakeshore Village SSPOL. No response was made to this correspondence. *See* Exh. 17, O'Driscoll May 19, 2020 letter.

25.     On November 19, 2020, Todd Martin of Nelson Forensics emailed Colucci its report. *See* Exh. 18, Nelson Forensics Nov. 19, 2020 email. Among other opinions, Nelson opined that granule loss from shingles as a result of hail impacts is functional damage. Exh. 18

at 25 (Nelson Report, 11/16/20; *see also* Exh. 19 at 243:12 – 268:19; 276:22 – 279:6 (Dep. of Colucci (Vol. II, 9/25/25)).

26.     On January 19, 2021, O'Driscoll emailed Colucci that it had been more than two months since General Star received the Nelson Forensics report which provided opinions that confirmed the obligation for General Star to extend coverage to its insured. *See* Exh. 20, O'Driscoll Jan. 19, 2021 email.

27.     On May 5, 2021, more than six months after receiving the Nelson report, Colucci wrote Lakeshore Village that "General Star hereby accepts coverage for the hail-related distress identified in the Nelson Forensics' report." *See* Exh. 21, General Star May 5, 2021 letter. No basis under the policy for the change in coverage was stated.

28.     On May 10, 2021, O'Driscoll emailed Colucci noting that General Star had taken 909 days since notice of the loss to accept coverage and that response to Lakeshore Village's Sworn Statement in Proof of Loss or its Amended Sworn Statement in Proof of Loss had been made. *See* Exh. 22, O'Driscoll May 10, 2021 email.

29.     On June 15, 2021, Colucci emailed O'Driscoll informing him of General Star's $1,000,000 "advance" payment. *See* Exh. 23, Colucci June 15, 2021 email.

30.     On October 4, 2021, Colucci wrote Holberton requesting that he revise the depreciation calculation from the pending Replacement Cost Value estimate to reflect the depreciation as of the earlier date of loss, rather than the date of the estimate, since the claim had been pending so long. *See* Exh. 24, Colucci Oct. 4, 2021 email.

31.     On October 8, 2021 Colucci wrote a letter to O'Driscoll outlining a net Actual Cash Value ("ACV") payment of $2,030,868.16 to Lakeshore Village. *See* Exh. 25, Colucci Oct. 8, 2021 letter.

32.     On April 21, 2022 Colucci wrote a letter to O'Driscoll regarding issuing a supplemental ACV payment of $222,419.00. *See* Exh. 26, Colucci April 21, 2022 letter.

33.     On July 7, 2022, Lakeshore Village filed suit against General Star. ECF 3.

34.     During his deposition on September 3, 2025, Colucci admitted that the ABS Report identified damage likely attributable to the 2018 hailstorm, but that the actual, unstated coverage basis for the denial was General Star's policy interpretation that nonfunctional, or cosmetic, damage was not covered as "direct physical loss or damage." Colucci also acknowledged that the coverage denial was only accurate if the Coverage grant in the policy were interpreted as not encompassing "nonfunctional damage." Colucci admitted: "There's no language, specifically, in the insured agreement regarding functional and non-functional damage." *See* Exh. 12 at p. 134; *see also id.* at 88:18 – 92:4 (Colucci Sept. 3, 2025 Deposition). Colucci acknowledged that General Star never stated that coverage interpretation to Lakeshore Village prior to suit. *Id.*, at 115:10 - 117:13; Exh. 19 at 308:23 – 310:9 (Colucci Sept. 25, 2025 Deposition).

35.     General Star endorsed its Policy to add Limitations on Coverage for Roof Surfacing to only actual cash value benefits, and exclude "cosmetic" damage to roof surfacing, for buildings with roofs that are 12 years old or more. ECF 3-1, Certified Copy of Policy, Endorsement – Commercial Property Form CP 10 36 10 12. No other potential limitation or exclusion of "cosmetic" damages is stated in the policy.

36.     General Star acknowledged that the endorsement limiting recovery for damages to roof coverings under certain circumstances does not apply to Lakeshore Village because the roofs at Lakeshore Village were less than twelve years old. *See* Exh. 12, Colucci Sept. 3, 2025 Deposition, p.87 ¶ 5-18; Exh. 1 at 34:18 – 36:23 (Dep. of Brad Thompson, Corp. Rep.).

37.    In his deposition, Brad Thompson, who was Calucci's supervisor and was designated as General Star's corporate representative, admitted that the more than 9-month delay between Lakeshore Village's July 4, 2019 letter and the April 6, 2020 General Star letter acknowledging the SSPOL was unreasonable according to industry standards. Exh. 1 at 130:7 - 17 (Dep. of Brad Thompson, Corp. Rep.).

38.    Colucci's eventual admission that the 9-month silence should not have happened aligns with what industry standards would characterize as an unreasonable delay. The file activity log notes that exist during this timeframe make clear that Colucci received the communications from O'Driscoll during this 9-month period, communicated with others about them, and affirmatively chose to make no contact with Lakeshore Village. A nine-month lapse without any communication or updated evaluation falls outside accepted practice for property claims, particularly for large commercial losses. Exh. 27, Report of Claims Handling Expert Elliott Flood at pp. 25 - 27, 29 - 31,

39.    General Star's representatives admitted that delays, especially the more than 9-month delay after the July 2019 letter, were unreasonable based on industry standards. General Star failed to accept coverage within a reasonable time after it knew or should have known coverage had been clearly triggered under its own policy interpretation. Had General Star investigated the information provided by Lakeshore Village in July 2019, instead of ignoring that information, it would have been led to accept coverage before Lakeshore Village submitted its own well-documented SSPOL in March 2020. Instead, GenStar delayed further by hiring Nelson Forensics and waiting until receipt of the Nelson report in November 2020, which showed clearly that covered damage had occurred during its policy period. GenStar still failed to accept coverage until May 2021, and made no payment until June 2021. It further delayed

actual cash value payments until October 2021, nearly a year after the Nelson report. This consistent pattern of delay was not reasonable under industry standards and led to long-delays in providing coverage benefits. *Id.*, p. 30.

## IV.    General Star's Breaches of Contract

In order to prevail on a breach of contract claim, the insured must prove: (1) the existence of a contract; (2) performance by Plaintiff or some justification for non-performance; (3) failure to perform the contract by General Star; and (4) resulting damages to Plaintiff. *See Long v. Cordain*, 343 P.3d 1061, 1066-67 (Colo. App. 2014) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). It is undisputed that a contract did exist between Lakeshore Village and General Star, that Lakeshore Village performed its duties under the contract, that General Star denied coverage under the policy, that Lakeshore Village submitted a Sworn Statement in Proof of Loss identifying covered damages of at least $5,059,920.64, (ACV, net of the deductible), and General Star admitted its denial was incorrect by accepting coverage over two years after its denial. *See* SOMF 1, 3 - 8, 15 - 16, 18 - 21, 27, 29, 31, 32. These undisputed facts satisfy all elements of breach of contract.

Under Colorado law, the interpretation of an insurance policy is a matter of law for the Court. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003). An insurance policy is a contract, which should be interpreted consistently with the well-settled principles of contractual interpretation. *Chacon v. Am, Family Mut. Ins. Co*., 788 P.2d 748, 750 (Colo. 1990). The words of the contract should be given their plain meaning according to common usage, and strained constructions should he avoided, with the aim of effectuating the contracting parties' intentions. *Ad Two, Inc. v. City & County of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000); *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990).

Further, the meaning of a contract must be determined by examination of the entire instrument, and not by viewing clauses or phrases in isolation. *U.S. Fid. & Guar. v. Budget Rent-A-Car Sys., Inc.,* 842 P.2d 208, 213 (Colo. 1992).

**A.  General Star Breached by Denying Coverage for Covered Property Physically Damaged By Hail During its Policy Period**

The policy provides coverage for "direct physical loss or damage" unless "the loss is excluded" from coverage. SOMF 4 - 5. Hail is a covered cause of loss, which is undisputed. SOMF 5. The coverage grant in the policy is quite broad, and covers physical loss or damage, whether functional or cosmetic. The only limitation of this coverage concerns roof coverings if the roof coverings are 12 or more years old, where the policy will not cover "cosmetic" damage, as defined. SOMF 35. General Star admits this endorsement is not applicable to this claim. SOMF 36.

While General Star has contended during discovery in this lawsuit that it interprets its policy to exclude coverage for cosmetic damages, the policy makes no such exclusion or limitation applicable under the circumstances. *See generally Schultz v. GEICO Casualty Co.*, 429 P.3d 844, 849 (Colo. 2018) (carrier not entitled to create new evidence in order to try to support its earlier coverage decision). Instead, its Limitation on Coverage for Roof Surfacing endorsement creates the only carve-out from its broad coverage for all physical damage where roof coverings are 12 years old or more. Exh. 28, ECF 3-1, Certified Copy of Policy, Endorsement – Commercial Property Form CP 10 36 10 12. If the policy did not generally cover cosmetic damages, this endorsement would not have been necessary to expressly limit that coverage. *See generally Fisher v. American Fam. Mut. Ins. Co.*, Civil Action No. 17-cv-01949-MEH, 2018 WL 4491423 *2 – 3 (D. Colo. 2018) (court notes that all cases court surveyed found aesthetic or cosmetic damage to a metal roof to be encompassed in contractual

term "physical loss or damage," citing *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*,

161 F. Supp. 3d 970, 977–78 (D. Kan. 2016) (phrase "physical loss or damage," within insuring

agreement section of property insurance policy stating that insurer would pay for risks of

physical loss or damage to covered property as result of occurrence, provided coverage for hail

indentations on metal seam roofs of buildings owned by insured, where cosmetic hail

indentations physically altered insured's property); and *Advance Cable Co. v. Cincinnati Ins.

Co.*, 788 F.3d 743, 746–48 (7th Cir. 2016) (in policy insuring to pay for "direct physical loss to

Covered Property caused by or resulting from a covered cause of loss," where metal roof panel

denting characteristic of hail impact was found on several buildings which varied in size from

barely discernable to approximately 1" diameter, but would not affect the performance of the

roof panels or detract from their life expectancy, court holds that both functional and cosmetic

losses are encompassed).

  The policy language used by General Star is clear and does not exclude coverage for

cosmetic damages. But even if there were any ambiguity in this case, the policy must be

interpreted in favor of coverage for the policyholder's loss including both functional and

cosmetic damages. *See generally Compass Ins. Co. v. City of Littleton*, 984. P.2d 606, 613

(Colo. 1999); *Bertisen v. Travelers Home and Marine Ins. Co.*, 710 F.Supp.3d 883, 886-93 (D.

Colo. 2024) (property policy that insures "against risk of direct physical loss to property" is

ambiguous in context of the loss and reasonable interpretation requires coverage for cosmetic

match of replacement roof tiles to existing).

  **1. General Star Breached by Ignoring the Damage Identified in the ABS report.**

  The ABS report finds hail impacts on shingles causing granule loss throughout the

complex on literally all roofs, denting to soft metals on all the roofs, and hail dents on gutters

and downspouts that may have occurred during its policy period in 2018. SOMF 7, 34. General
Star's denial of coverage for all such damage was incorrect, and breached the policy. SOMF 8.

### 2. General Star Misrepresented the Basis for its Denial.

General Star also misrepresented the basis for its denial by telling Lakeshore Village that
the ABS report had determined the hail damages to the property occurred outside the policy
period. SOMF 8. The undisputed record shows no such definitive opinion in that report. SOMF
7, 34. The stated basis for denial, which was false, materially breached the policy by
withholding the benefits of the policy.

### 3. General Star Misapplied its Coverage.

Other than the Endorsement, which has no application to Lakeshore Village's claim,
there is no language in the policy that excludes or limits coverage based on whether damage is
found to be functional or cosmetic. Exh. 28, ECF 3-1, Certified Copy of Policy; SOMF 36. The
damages claimed by Lakeshore Village are covered and General Star breached the contract by
denying coverage to its insured. *See Great Lakes Ins., S.E. v. Highland West LLLP*, Civil Action
No. 19-cv-00508-LTB, 2020 WL 8187750 *1, 3-5 (D. Colo. 2020) (interpreting all-risk
commercial policy, Court finds cosmetic damages covered except as specifically excluded for
roof coverings and siding). General Star admitted that breach by reversing the decision more
than two years later in May 2021. SOMF 27. *See Andres Trucking Co. v. United Fire and Cas.
Co.,* 488 P.3d 425, 431, ¶ 25 (Colo. App. 2018) ("breach of insurance contract may be based not
merely on the insured's [sic] ultimate financial liability, but also on 'the insurer's conduct in
unreasonably refusing to pay a claim,' 'delaying payments,' and 'failing to act in good faith.'");
*Wilson v. Humana Health Plan, Inc.,* 2015 WL 849210 *2-3 (D. Colo. 2015) (initial incorrect

denial of claim still actionable breach of contract though insurer reversed denial after internal appeals process).

### 4. General Star Failed to Investigate.

General Star also breached by refusing to investigate. After denying Lakeshore Village's claim in March 2019, General Star was provided with technical information from Lakeshore Village's claim professional that contradicted the unsupported findings in the ABS report. General Star did nothing to evaluate this information and provided no response to Lakeshore Village regarding these authorities. SOMF 16, 19. Its admission two years after denial based on the Nelson Report that hail impacts causing granule loss caused functional damage and are covered – regardless of its alleged policy interpretation – does not nullify liability for the prior breach. *See Andres Trucking Co., supra*; *Wilson v. Humana Health Plan, Inc.*, *supra*.

On this undisputed record, partial summary judgment should enter on the First Claim for Relief establishing General Star's liability for breach of contract.

### V. General Star Violated the Unreasonable Delay/Denial Statute

Here, the undisputed record shows both an unreasonable denial of Lakeshore Village's claim from March 2, 2019 through May 5, 2021, and multiple unreasonable delays of its claim for benefits. Indeed, during the extended period of General Star's denial, it wholly ignored continuing substantive communications from its insured for over nine months while refusing to investigate the information it had been provided. SOMF 17 - 21. When General Star did finally investigate whether the roofs had suffered damages of the nature supported in its insured's July 4, 2019 letter, it admitted coverage in May 2021. SOMF 25, 27. These delays, by General Star's own admission in light of industry standards, were unreasonable. SOMF 37 - 39; *see, e.g., Peden v. State Farm Mut. Auto. Ins. Co*., 841 F.3d 887, 890-91 (10th Cir. 2016) (based on

industry standards, fact-finder could determine insurer failed to reasonably investigate and communicate); *Norman v. State Farm Fire and Cas. Co.*, Civil Action No. 13-cv-01643-PAB-CBS, 2014 WL 6478046 *6-8 (D. Colo., November 19, 2014) (additional inspections could have been conducted earlier in the claims handling process, leading to unreasonable delay); C.R.S. § 10-3-1104(1)(h)(IV).

### 1.  General Star Unreasonably Denied Coverage

General Star's own investigation based on the ABS report identified damages to the insured property that could not be definitively determined to have occurred outside the policy period. Yet, General Star chose to interpret the ABS report as having conclusively determined the actual dates of damage, which was unfounded based on the report's language. Ignoring the results of its own investigation was unreasonable, and General Star concealed during adjusting that its real basis for denial was its interpretation of the policy to exclude coverage for cosmetic damages. SOMF 7, 34. Although General Star's coverage interpretation is incorrect, its misrepresentation of the basis of its denial was unreasonable. *See* C.R.S. § 10-3-1104(1)(h)(I); *see also Brodeur v. American Home Assur. Co.,* 169 P.3d 139, 147 n. 7 (Colo. 2007) (insurer's bad faith can occur in the unreasonable refusal to investigate a claim or to gather facts). This conduct establishes liability under C.R.S. § 10-3-1115.

### 2.  General Star Unreasonably Delayed Investigation

Lakeshore Village's adjuster provided substantive authoritative information to General Star in July 2019 establishing that the damage identified by ABS, hail-caused granule loss to shingles, was functional. General Star ignored this information until May 2021, and then accepted coverage only after its own engineer, Nelson Forensics, had investigated and agreed with that authoritative information. SOMF 7, 8, 16 – 19, 24 – 25, 27. General Star failed to

communicate at all in response to substantive information related to investigation of the claim from its insured between July 4, 2019 and April 6, 2020. SOMF 16 - 21. General Star's Corporate Representative and supervising adjuster on the claim admitted this nine-month delay was unreasonable under insurance industry standards. SOMF 37; SOMF 38 - 39.

### 3. General Star Unreasonably Delayed Payment of Benefits

The record here is also undisputed that General Star delayed investigation and payment of benefits for more than two years from its denial. It refused to communicate in reply to the public adjuster's July 2019 communications providing substantive, authoritative information showing the damages identified in the ABS report were functional. SOMF 8, 16 – 19. General Star did not investigate, and it *never* responded to Lakeshore Village to address the information. Ever. *Id*. General Star failed to acknowledge the conclusive impact of the July 4, 2019 authoritative information until it received the Nelson Forensics engineering report in November 2020. SOMF 25 - 27. Even then, it refused to give effect to Nelson's conclusions for another six months, when it finally reversed its erroneous coverage denial on May 5, 2021. SOMF 27. This extended delay was unreasonable based on undisputed industry standards.

These delays, singly and in combination, were unreasonable as a matter of law under the Unreasonable Delay/Denial Statute and Colorado unfair claim handling standards, C.R.S. § 10-3-1104 (1)(h). *See generally Baumann v. American Family Mut. Ins. Co.*, 2012 WL 122850 *4 (D. Colo. 2012) (liability under § 10-3-1115 arises even though amount of damages owed not yet determined). General Star has submitted no expert opinions concerning claim handling or compliance with industry claim handling standards, and has no admissible evidence to dispute these conclusions. Partial summary judgment of liability for violation of the Unreasonable Delay/Denial Statute should enter on the Third Claim for Relief.

## Conclusion

The undisputed record shows that General Star breached its policy contract by its denial of Lakeshore Village's hail loss claim in March 2019, and failures to investigate thereafter. Partial summary judgment determining General Star's liability should enter.

The record also shows – and even General Star admits – that it acted unreasonably based on industry standards by refusing to respond to the July 2019 communications from Lakeshore Village for more than nine months; it unreasonably misinterpreted the clear language of the ABS report to claim that no hail damage occurred during its policy period; it misrepresented the policy basis on which it denied the claim; and its delays in maintaining its unfounded denial for more than two years were unreasonable as a matter of law. Partial summary judgment finding liability under the Unreasonable Delay/Denial Statute should enter.

The only remaining triable issues for the Court and jury are the final amount of the cost to repair the loss and available benefits and damages under the policy, damages under the Second Claim for common law bad faith breach, and the remedy under C.R.S. § 10-3-1116.

Respectfully submitted,

*s/Christopher N. Mammel*
Christopher N. Mammel
Merlin Law Group, P.A.
1001 17th Street, Suite 1150
Denver, CO 80202
Phone: 720.665.9680
Fax: 720.665.9681
Email: cmammel@merlinlawgroup.com

Attorneys for Plaintiff Lakeshore Village
Homeowners Association

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 29, 2025, I served the foregoing via ECF to

Counsel for Defendant, James Holbrook, Esq. (jholbrook@zelle.com) and Jennifer Gibbs, Esq.

(jgibbs@zelle.com).

s/Tamara Chen-See